**IN THE SUPREME COURT OF THE STATE OF IDAHO**
**Docket No. 36983**

| | |
|---|---|
| IN THE INTEREST OF: JOHN DOE, A MINOR CHILD UNDER 18 YEARS OF AGE. <br> -------------------------------------------------------- <br> IDAHO DEPARTMENT OF HEALTH & WELFARE, <br><br>    Petitioner-Respondent, <br><br> v. <br><br> JOHN DOE I, <br><br>    Respondent-Appellant <br><br> and <br><br> JANE DOE, <br><br>    Respondent. | Boise, June 2010 Term <br><br> 2010 Opinion No. 76 <br><br> Filed: June 30, 2010 <br><br> Stephen W. Kenyon, Clerk |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Cathleen MacGregor-Irby, Magistrate Judge.

Magistrate court decision terminating parental rights, <u>affirmed.</u>

Adam Carl Kimball, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent.

_____

**SUBMITTED ON THE BRIEFS**

BURDICK, Justice

John Doe I (hereinafter Doe) appeals from the magistrate court's Memorandum Decision and Order terminating his parental rights to his child, D.C., entered September 21, 2009.[1] We affirm.

---

[1] The parental rights of the child's mother were also terminated at this time, but this appeal involves only the termination of Doe's parental rights.

## I. FACTUAL AND PROCEDURAL BACKGROUND

D.C. was born in 1999. On April 4, 2000, a child protection referral was made in Moscow, Idaho, regarding the care of D.C. According to the reporting party, Doe and D.C.'s mother (Mother) had taken D.C. to a babysitter's house and did not follow through with plans to pick up D.C., leaving the babysitter with no supplies, such as milk, with which to care for D.C. The report was coded as an information and referral only, and no further action was taken.

On April 3, 2003, a child protection referral was made in St. Maries, Idaho, regarding health and safety concerns with the family's residence. Concerns of controlled substance abuse by Doe were also reported. A social worker visited the home and observed that there was no running water and the sewer system was not functioning.

On April 26, 2004, another child protection referral was made regarding the neglect of D.C. According to the referent, Doe and his girlfriend (S.R.) left D.C. and S.R.'s children with an aunt and uncle for several weeks and did not return to pick them up until forced to do so. The referent also noted substantial controlled substance abuse by Doe and S.R. Subsequent reports alleging child abuse and neglect were reported and attached to this initial presenting issue, including concerns about domestic violence by Doe against S.R., inappropriate physical discipline by Doe of S.R.'s children, and severe neglect of the children. These reports were also coded as information and referral only.

On March 22, 2007, D.C. was placed in foster care after Doe was arrested on a warrant for drug related charges. At that point in time, Mother had not had contact with D.C. for several years. The Department of Health and Welfare (Department) worked with Doe and assisted him with services to address drug and alcohol issues, parenting skills, anger management, employment, housing, and other identified needs. D.C. was reunited with Doe in October 2007.

On November 10, 2007, a child protection referral was made in Boise, Idaho, indicating that Doe had a felony warrant out for his arrest and the reporting party was concerned about what Doe would do with D.C. should he be arrested. The referral was coded as an information and referral only.

On April 18, 2008, Doe was incarcerated for violation of a no-contact order issued between him and S.R. D.C. was declared in imminent danger at that time due to Doe's incarceration. Before D.C. was returned to Doe, Doe was again arrested on May 3, 2008, in Cascade, Idaho, for driving under the influence, domestic violence, reckless driving, eluding law

enforcement, and fleeing the scene of an accident. In its Report of Investigation filed May 8, 2008, the Department requested that the Department be granted legal custody of D.C., and recommended that the following case plan be completed by Doe:

1. [Doe] will successfully complete the fifty-two weeks of domestic violence treatment through Tom Wilson Counseling, as ordered by his probation requirements.

2. [Doe] will participate in a mental health or psychological evaluation to determine any undiagnosed mental illness and determine the effect of any diagnosed mental health issues on his capacity to parent. All recommendations are to be followed and demonstrated.

3. [Doe] will participate in a substance abuse assessment/evaluation approved by the assigned Department social worker and will follow any and all recommendations, including random drug tests at the discretion of the assigned Department social worker. The drug tests will be free of alcohol, illegal substances, and controlled substances not prescribed by a licensed physician. Legal controlled substances will not exceed prescribed levels.

4. [Doe] will obtain/maintain a stable, safe and healthy home environment for himself and his child. [Doe] will keep the home free of any health and safety hazards. No other persons may reside in the home without the prior approval of the Department social worker. He will allow the assigned Department social worker and the Guardian Ad Litem to conduct random home visits.

5. [Doe] will obtain and maintain appropriate employment/income to provide for himself and his child. [Doe] will provide the assigned Department social worker with the necessary documentation to verify his income and legitimate employment.

6. [Doe] will address and resolve any pending legal issues, comply with the terms of his probation, and refrain from further illegal activity which may result in his arrest/incarceration.

On June 19, 2008, the magistrate court issued its Findings of Fact, Conclusions of Law and Order of Legal Custody and Order Approving Case Plan as to the Father, approving the case plan suggested by the Department on June 3, 2008. The steps outlined in the case plan were the same as the six recommendations made in the Report of Investigation.

On October 1, 2008, a Report to the Court for the Six Month Review Hearing was filed with the magistrate court. The Report stated that Doe did not have his own housing; D.C. was thriving in his current foster placement; Doe was in the process of completing his court ordered case plan but the social worker had not received a progress report from Tom Wilson Counseling; Doe had been spotted with S.R., but denied that it was her; Doe was participating in out-patient

3

treatment and cognitive self-change; and Doe had provided a few pay stubs but the finances shown in the paystubs did not provide sufficient financial means for Doe or D.C.

The guardian ad litem also filed a report for the six-month review hearing. The guardian ad litem stated as to Doe: "[Doe] is working on his case plan. This guardian believes that [Doe] truly cares for his son and wants to be a parent to him. However, [Doe] has yet to demonstrate that he is able to maintain stability through employment and managing his mental health. [Doe] also has much further to go in his domestic violence treatment."

On January 15, 2009, the Department filed a Permanency Hearing Affidavit recommending that proceedings be initiated to name the child's maternal grandparents as his guardians. That affidavit stated that on November 20, 2008, Doe's hair follicle test was positive for methamphetamine. It also stated that Doe had not enrolled in the recommended treatment classes nor followed through with the recommendations made following his psychological evaluation on July 29, 2008, and that Doe was continuing to reside with S.R. The affidavit also stated the following:

> While this worker knows and has observed [Doe]'s love for his son, there are significant concerns about his ability to provide a safe, stable, and structured home environment for [D.C.] that is free of controlled substances and domestic violence. As of November, 2008, [Doe] has tested positive for methamphetamine. On December 19, 2008, [Doe] reportedly contacted an individual in the community in an attempt to "score some sh--." This individual provided this information to the Department, stating that [Doe] was "looking for methamphetamine" and "hung up the telephone when asked if he knew who he called." [Doe] continues to support his relationship with [S.R.], whose children are also in foster care. It is this worker's understanding that [S.R.] is not making substantial progress on her case plan. It is this worker's observation that [Doe] repeatedly chooses his relationship with [S.R.], one with a history of significant domestic violence and controlled substance abuse, over his relationship with his son. . . .

On February 26, 2009, the magistrate court issued its Order for Guardianship, finding that guardianship would be with the child's maternal grandparents without a termination of the parent and child relationship.

On May 4, 2009, the State filed a Motion to Amend the Permanency Plan, seeking to terminate Doe's parental rights. The affidavit in support of the motion to amend the permanency plan stated that the request for placement with the child's maternal grandparents through the Interstate Compact process had been denied.

4

On June 5, 2009, the State filed a Petition for Termination of Parent-Child Relationship. Count II stated that Doe "neglected the child by failing to comply with the Court's orders in a child protective act case or the case plan, and reunification of the child with his parent has not occurred within fifteen (15) of the last twenty-two (22) months from the date the child entered shelter care." Count III alleged:

> The child is neglected as he is without proper parental care and control necessary for his well-being because of the conduct or omission of his parents, as follows: The father has failed to demonstrate consistency in housing, employment and/or abstinence from controlled substances which impairs his ability to provide proper parental care for his child.

On June 19, 2009, the court issued its Order Approving Termination and Adoption as the Permanent Plan. A hearing was held on July 16, 2009, where testimony was offered by: (1) the detective who declared D.C. to be in imminent danger in both March 2007 and April 2008; (2) the case manager from the Department; (3) a file clerk from the counseling center for drug and alcohol addiction; (4) an associate judge with the Assiniboine and Sioux Tribes of Fort Peck;[2] and (5) Doe.

The detective testified that law enforcement responded to Doe's home on April 18, 2008, because D.C.'s school had called in a welfare check as D.C. had not been at school. Officers entered the home because they observed a small child who appeared to be four or five years old looking out the window of the house and when no one answered the door the officers were concerned that the child had been left by herself. S.R. was inside the home and informed officers that D.C. had stayed home from school because he was sick, but D.C. told officers he was not sick and he appeared to be in good health. S.R. was unable to produce any paperwork giving her authority to care for D.C. and she was unable to contact Doe. The detective also testified that, based upon her training in law enforcement and drug issues, she felt S.R. was "under the influence of a substance, probably methamphetamine." When officers informed S.R. that they were going to declare D.C. to be in imminent danger, S.R. bolted upstairs, where officers followed and found Doe hiding in a closet, in violation of the no-contact order with S.R. The detective also testified that the school had sent home "numerous information [sic] that [D.C.] needed eyeglasses" because he could not see, but Doe had not taken care of it.

---

[2] Mother is a tribal member and thus contact with the tribe was required under the Indian Child Welfare Act.

The case manager testified that D.C. had been in foster care for fifteen consecutive months, and that Doe had "five or six" child protection referrals prior to D.C. coming into foster care in April 2008. The case manager went into detail on the case plan that Doe was given in 2007, and stated that Doe had "sufficiently accomplished the tasks that he needed to to ensure that the reasons that [D.C.] entered care initially were taken care of" in October 2007. The case manager further stated that when D.C. was placed in foster care in April 2008, the only concerns regarding D.C.'s care involved him not attending school and Doe not following through with getting D.C. glasses.

The case manager then testified regarding Doe's compliance with the case plan that was filed on June 3, 2008. Regarding Doe maintaining a safe and stable home, the case manager identified six different residences that Doe resided at between April 2008, and the time of the hearing, and stated that this was a concern to the Department because "[i]f [D.C.] were living with [Doe] at that time, he would have been switching schools. He would have been switching friends. It's not a stable environment for him. And he is very impressionable at his age and really needs a stable, firm foundation." Doe also resided with unapproved individuals in several of the residences. Doe was then incarcerated from mid-January 2009 until late January 2009 and then from mid-February 2009 up through the time of the hearing in July 2009.

As to Doe's employment, the case manager testified:

> It's been sketchy, at best. He has reported employment, at times, but has never provided a pay stub. . . . [W]ithout employment, you're not able to obtain housing. You're not able to have food. Again, going back to the stability that needs to be provided to his son, you are not able to do that without having secure employment or finances of some sort.

In addition, Doe had been charged with four different misdemeanors, which concerned the case manager because Doe was "not able to be a stable and consistent parent for his son. He is continually in and out of jail with pending jury trials. He could go to prison. I don't know what the outcome of those criminal charges will be. Subsequently, [D.C.] will have nowhere—nowhere to go."

The case manager further testified that Doe did not provide her with proof of completion of the ordered fifty-two weeks of domestic violence treatment. Doe had not provided her with proof that he was meeting any of the recommendations relating to his mental health and substance abuse, including attending psychiatric treatment, complying with medication management, attending outpatient treatment, and participating in a cognitive self-change course.

6

Finally, the case manager stated that Doe's compliance with random drug testing had "been hit and miss."

The case manager also spoke as to how well D.C. was doing in foster care and Doe's interactions with D.C. D.C. was taking violin lessons, participating in the Boy Scouts, playing sports, and attending summer camp. While in foster care, he was doing well in school and had no behavioral problems. According to the case manager, Doe "engages with [D.C.] very well. He is very kind to his son the times that he is supervised. . . he truly does care for his son. He does have that connection there and really cares for him."

The filing clerk from the counseling center testified that Doe missed five scheduled classes between November 2008 and January 2009, attending only one treatment session. After five absences, a person is taken out of the program.

Doe testified that he completed thirty hours of his domestic violence classes before becoming incarcerated. He also stated that he checked himself out of the counseling program and transferred his treatment to another program where he was going to be living. Around that time, however, he was arrested. He stated that all he could do while he was in prison from February 10, 2009, until June 28 or 29, 2009, in the Valley County jail was AA and church because there were no other programs. Doe further stated that although Ada County offers more programs, he has been unable to join them because of the high cost of the classes.

The magistrate court admitted five exhibits during the hearing, including two "Road to Recovery Assessment Summary" documents prepared by a substance abuse liaison, a document detailing Doe's criminal history in Ada County, a psychological evaluation of Doe, and a summary of Doe's drug testing results from May 2007 through November 2008.

On September 21, 2009, the magistrate court terminated Doe's parental rights to D.C. based upon its findings that Doe neglected the child by failing to comply with the court's orders in the case plan and reunify within fifteen of the last twenty-two months, and by failing to demonstrate consistency in housing, employment, and/or abstinence from controlled substances, impairing his ability to provide proper parental care for D.C. In addition, the court concluded that termination of parental rights would be in the best interest of the child. On October 5, 2009, the final decree was issued. Doe timely filed his Notice of Appeal.

## II. ANALYSIS

"When the State intervenes to terminate the parent-child relationship, the requisites of due process must be met. This requirement necessitates the State prove the grounds for terminating a parent-child relationship by clear and convincing evidence." *In re Doe*, 143 Idaho 343, 345, 144 P.3d 597, 599 (2006) (internal citation omitted). "[W]here the trial court has explicitly determined the case by application of the clear and convincing evidentiary standard, this Court must determine if the decision was supported by substantial and competent evidence." *In re Doe*, 146 Idaho 759, 761, 203 P.3d 689, 691 (2009). Substantial competent evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Folks v. Moscow Sch. Dist. No. 281*, 129 Idaho 833, 836, 933 P.2d 642, 645 (1997) (quoting *Welch v. Cowles Publ'g Co.*, 127 Idaho 361, 365, 900 P.2d 1372, 1376 (1995)).

**A. There is substantial and competent evidence supporting the magistrate court's determination that Doe neglected D.C.**

Idaho's Termination of Parent and Child Relationship Act includes in its purpose:

> Implicit in this chapter is the philosophy that wherever possible family life should be strengthened and preserved and that the issue of severing the parent and child relationship is of such vital importance as to require a judicial determination in place of attempts at severance by contractual arrangements, express or implied, for the surrender and relinquishment of children.

I.C. § 16-2001(2). In that spirit, I.C. § 16-2005 permits the Department to petition the court for termination of the parent-child relationship when it is in the child's best interest and one of the following factors exist: (a) abandonment, (b) neglect or abuse, (c) lack of a biological relationship between the child and a presumptive parent, (d) inability to discharge parental responsibilities, or (e) incarceration of parent for a substantial period of time during the child's minority. The magistrate court here found that the Department proved the following grounds for termination of the parent-child relationship by clear and convincing evidence: (1) neglect as defined in I.C. § 16-2002(3)(a) and I.C. § 16-1602(25), and (2) neglect as defined in I.C. § 16-2002(3)(b).

Idaho Code § 16-2002(3)(a) provides that "neglected" means conduct as defined in I.C. § 16-1602(25), which includes a child who:

> [I]s without proper parental care and control, or subsistence, medical or other care or control necessary for his well-being because of the conduct or omission of his parents, guardian or other custodian or their neglect or refusal to provide them . . . or. . . [w]hose parents, guardian or other custodian are unable to discharge their

responsibilities to and for the child and, as a result of such inability, the child lacks the parental care necessary for his health, safety or well-being.

I.C. § 16-1602(25)(a)-(b). Idaho Code § 16-2002(3)(b) defines "neglected" as "[t]he parent has failed to comply with the court's orders in a child protective act case or the case plan, and reunification of the child with his or her parent(s) has not occurred within the time standards set forth in section 16-1629(9), Idaho Code." Idaho Code § 16-1629(9) states:

> There shall be a rebuttable presumption that if a child is placed in the custody of the department and was also placed in out of the home care for a period not less than fifteen (15) out of the last twenty-two (22) months from the date the child entered shelter care, the department shall initiate a petition for termination of parental rights. This presumption may be rebutted by a finding of the court that the filing of a petition for termination of parental rights would not be in the best interests of the child or reasonable efforts have not been provided to reunite the child with his family, or the child is placed permanently with a relative.

This statute "merely creates a presumption in favor of the department initiating a termination petition when a child has been in the state's custody and not in the parent's care for fifteen out of twenty-two months. It does not create a presumption that it is in the best interests of the child to terminate parental rights." *State v. Doe*, 144 Idaho 534, 536, 164 P.3d 814, 816 (2007).

In the instant case, the State sought to terminate Doe's parental rights on the basis of neglect. The magistrate court agreed with the State and held there was clear and convincing evidence that Doe neglected D.C. by failing to comply with the court's orders in the case plan and reunify within fifteen of the last twenty-two months, and by failing to demonstrate consistency in housing, employment, and/or abstinence from controlled substances, impairing his ability to provide proper parental care for the child. We affirm.

Over an eight-year span, Doe was the subject of six referrals to the Department regarding his care of D.C. and other children. Reports from 2003 and 2004 included concerns about Doe's abuse of controlled substances as well as domestic violence. D.C. was first placed in foster care in March 2007, following Doe's arrest on drug related charges. D.C. was reunited with Doe six months later, after the Department worked with Doe on services to address drug and alcohol issues, parenting skills, anger management, employment, and housing. D.C. was then placed in foster care on April 18, 2008, once again as a result of Doe's incarceration.

A case plan was approved by the court on June 19, 2008, requiring Doe to complete fifty-two weeks of domestic violence treatment; participate in a mental health evaluation and follow any recommendations; participate in a substance abuse evaluation and follow any

9

recommendations, including random drug tests; obtain and maintain a stable, safe and healthy home environment for himself and D.C. in which no unauthorized persons resided; obtain and maintain appropriate employment/income to provide for himself and D.C.; and refrain from further illegal activity.

At the hearing on July 16, 2009, the case manager testified that Doe had not provided her with proof of completion of the ordered fifty-two weeks of domestic violence treatment. Doe testified that he had completed thirty hours before he was incarcerated in January 2009. Regarding Doe's participation in a mental health program, the case manager testified that Doe had failed to provide her with proof that he was meeting any of the recommendations relating to his mental health and substance abuse, including attending psychiatric treatment, complying with medication management, attending outpatient treatment, and participating in a cognitive self-change course. Doe stated that he had checked himself out of the counseling program and transferred this treatment to another program, but that upon his incarceration he did not have access to the required programs. The case manager also testified that Doe's compliance with random drug testing was "hit and miss," and the Permanency Hearing Affidavit filed on January 15, 2009, had stated that Doe's November 20, 2008, hair follicle test was positive for methamphetamine.

Testimony at the hearing also indicated that Doe was not maintaining a stable home environment. The case manager identified six residences that Doe had resided at between April 2008, and the hearing, not including the jails at which he was incarcerated. Doe also did not provide the case manager with pay stubs that indicated he was maintaining employment and was able to provide for himself and D.C. Finally, Doe was arrested in January 2009, and at the time of the hearing in June, Doe was still incarcerated, with four misdemeanor counts pending.

Based upon the testimony at trial and the reports issued by the Department, we find that the magistrate court based its determinations that Doe failed to comply with the court's ordered case plan, and failed to demonstrate consistency in housing, employment, and abstinence from controlled substances upon substantial and competent evidence.

**B. There is substantial and competent evidence supporting the magistrate court's determination that termination was in D.C.'s best interest.**

"When a judge finds a statutory ground, such as neglect, he or she must then decide if termination of parental rights is in the best interests of the child[]." *Doe v. Dept. of Health and Welfare*, 141 Idaho 511, 516, 112 P.3d 799, 804 (2005). The magistrate court here found that it

was in the best interest of D.C. to have Doe's parental rights terminated because Doe "cannot provide safety and stability to [D.C.]." We hold that there is substantial and competent evidence to support the court's finding that termination is in the best interest of D.C.

### III.  CONCLUSION

This Court affirms the magistrate court's order terminating Doe's parental rights to D.C. Costs to respondent.

Chief Justice EISMANN and Justices J. JONES, W. JONES, and HORTON, **CONCUR.**